UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Tylor Armstrong, et al., | No. 2:21-cv-00779-KJM-KJN |
| Plaintiffs, | ORDER |
| v. | |
| County of Placer, et al., | |
| Defendants. | |

Plaintiffs Tylor Armstrong and Kimberly Armstrong move for a temporary restraining order barring defendants AT&T Mobility (AT&T) and any persons acting in concert with it from beginning construction of a cellphone tower close to their second home in Lake Tahoe. *See generally* Mot. TRO, ECF No. 4; Mem. P&A (Mem.), ECF No. 4-1; Compl., ECF No. 1. Construction is scheduled to commence May 3, 2021.[1] Mem. at 1. **The motion is denied**.

---

[1] Plaintiffs filed this motion for a temporary restraining order and preliminary injunction on April 30, 2021 at 2:57 p.m. *See generally* Mot. TRO. Just over an hour later, this court issued a minute order directing plaintiffs to inform defendants AT&T, Martis Camp Club, and Martis Camp Community that if they wished to file an opposition to the TRO they must do so by May 1, 2021 at 5:00 p.m. Minute Order, ECF No. 7. Plaintiffs' counsel promptly called the court to confirm the May 1 deadline was on the Saturday and the courtroom deputy confirmed it was. Plaintiffs have not filed any notice confirming that they complied with the court's directive. Martis Camp Club and Martis Camp Community represent they received no communication from plaintiffs regarding their filing deadline, Opp'n at 2 n.1, although these defendants obviously learned of plaintiffs' motion somehow. Plaintiffs are **ordered** to file a notice of their efforts to

1

## I. BACKGROUND

In 2011, plaintiffs purchased vacant land in Martis Camp, a private "luxury community" in the Lake Tahoe area. Mem. at 2, 7; Compl. ¶ 17. Martis Camp is managed by defendants Martis Camp Club and Martis Camp Community Association, "non-profit" corporations that manage parcels of real property and facilities for its members. TRO Opp'n at 2 (Opp'n), ECF No. 8. The Armstrongs chose to build their second home in Martis Camp because it offers "premier amenities and incredibly breathtaking views." Aff. Tylor Armstrong ¶ 1 (Armstrong Aff.), Mot. TRO, ECF No. 4-2.

The Armstrongs built the Residence, an approximately $10.75 million dollar property with "unobstructed" and "stunning views of the nearby golf course and Northstar's Lookout Mountain." *Id.* ¶ 3; Mem. at 2. On average, the Armstrongs spend ten weeks a year in this second home. Armstrong Aff. ¶ 3.

In 2015, while they both were on the golf course, Martis Camp Club's Chief Operating Officer, Mark Johnson, spoke with Tylor Armstrong and shared that Martis Camp was considering contracting with Verizon for construction of a cell tower near the Residence. Armstrong Aff. ¶ 4. At the time, details of the plan were sparse. *See id.* In October 2016, Mr. Armstrong reached out about the cell tower construction project and was told he would be kept informed of future developments. *Id.* ¶ 5.

At some point, Martis Camp ceased working with Verizon and began discussions with a new service provider, AT&T. *See* Armstrong Aff. ¶¶ 6, 15; Opp'n at 3. Martis Camp ultimately gave permission to AT&T to build a 110 foot "5G" cellphone tower at 7951 Fleur Du Lac Drive, Truckee, California 96161, within "a few hundred feet" from the Residence. Armstrong Aff. ¶ 6; *see also* Mem. 1-2 (referencing "the contract for the construction of the tower between AT&T and defendant the Martis Camp community"). The new cell tower, once constructed, will be visible from every window of the Residence except the master bedroom and will "entirely destroy the overwhelmingly pristine, charming and breathtaking views from [the Armstrongs'] property."

---

comply with the court's directive to notify certain defendants of the May 1 deadline and if they did not provide notice as directed their reasons for not doing so.

Armstrong Aff. ¶ 6. Plaintiffs, through Mr. Armstrong, aver they were never informed of the new plans to proceed with AT&T by either the Martis Camp leadership or defendant Placer County. *Id.* ¶¶ 9, 22–25.

The Armstrongs recently decided they wanted to have a home closer to their children and decided to sell their Martis Camp home. *Id.* ¶ 32; *see* Mem. at 2. In March 2021, the Armstrongs entered into a contract for the sale of the Residence for $10.75 million. Armstrong Aff. ¶ 10. The prospective buyer put down a deposit of $322,500 dollars and agreed to a rapid closing schedule: 14 days for contingency inspections and 17 days for closing. Compl. ¶ 72. The Armstrongs did not disclose the prospect of a cell tower being constructed nearby. *Id.* ¶ 74.

On March 29, 2021, the Armstrongs' real estate agent learned of the plan for a cell tower. *Id.* ¶ 75. She informed the Armstrongs they needed to disclose the existence of the construction plans to the buyer. Armstrong Aff. ¶ 14. The Armstrongs still chose not to inform the buyer as they "did not know if AT&T had a valid contract with Martis Camp or secured its necessary permits. . . . [nor] how . . . the project would [] impact[] the Residence." *Id.* ¶ 15.

Ultimately, after pressure from their real estate agent, plaintiffs agreed to allow Martis Camp to disclose some of the cell tower details to the buyer. Compl. ¶ 79. The buyer requested a few additional days to explore the implications of the cell tower construction site in close proximity to the home; the Armstrongs did not grant the request for more time. Armstrong Aff. ¶¶ 18–19. On April 1, 2021, the buyer withdrew his offer and cancelled his contract with the Armstrongs. *Id.* ¶ 20. Plaintiffs now believe the cell tower will cause "significant adverse aesthetic impacts to our property," *id*. ¶ 9, and potentially reduce the property value by approximately 2 million dollars, Compl. ¶ 65.

Defendants Martis Camp Club and Martis Camp Community Association have opposed the request for a temporary restraining order and paint a different picture than that suggested by plaintiffs. In their opposition, the Martis Camp defendants state that plans for the cell tower were discussed in June 2019 at one of Martis Camp's regularly scheduled Board meetings. Opp'n at 3; *see also* June 15, 2019 Martis Camp Club Board of Directors Meeting at 4, Ex. B, Opp'n, ECF No. 8-1. Defendants aver that public notices "were mailed by the County to property owners of

record within 300 feet of the site proposed for the cell tower." Decl. of Chief Operating Officer of Martis Camp Club Mark Johnson (Johnson Decl.) ¶ 12, ECF No. 8-1. Plaintiffs' complaint alleges the cell tower will be "roughly a few hundred feet" from the Residence. Compl. ¶ 23; Armstrong Aff. ¶ 12 (noting "prospect of a 5G cell tower in very close proximity to the Residence"). Defendants also say Mr. Armstrong sent an email to Martis Camp executive staff and Board Members on April 7, 2021, slightly less than a month ago, that he would file suit before May 3, 2021. Johnson Decl. ¶¶ 13–14.

On April 30, 2021, three days prior to the start date for construction of the cell tower, on a Friday afternoon, plaintiffs filed their complaint, making eleven claims. *See generally* Compl. The first four claims are brought against Placer County and allege the County deprived plaintiffs of their property without due process and deprived them of their First Amendment rights to protest the cell tower's approval. Compl. ¶¶ 88–112. Plaintiffs bring six claims against Martis Camp Community Association and Martis Camp Club alleging breach of contract, breach of fiduciary duty, breach of implied covenant of good faith and fair dealing, negligence, intentional interference with prospective economic advantage, intentional interference with a contractual relationship, and negligent interference with prospective economic advantage. *Id.* ¶¶ 113–164. Plaintiffs' motion for a temporary restraining order and preliminary injunction seeks to enjoin AT&T and others acting in concert with it from commencing construction of the cell tower on May 3, 2021.

## II.  LEGAL STANDARD

A temporary restraining order or "TRO" may be issued only upon a showing "that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A). The purpose of such an order is to preserve the status quo and to prevent irreparable harm "just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 439 (1974). A TRO is an extraordinary remedy, and a plaintiff who requests a TRO must prove that remedy is proper by a clear showing. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

/////

4

In determining whether to issue a temporary restraining order, a court applies the factors that guide the evaluation of a request for preliminary injunctive relief: whether the moving party "is likely to succeed on the merits, . . . likely to suffer irreparable harm in the absence of preliminary relief, . . . the balance of equities tips in [its] favor, and . . . an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Stuhlbarg Int'l. Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (stating that the analysis for temporary restraining orders and preliminary injunctions is "substantially identical").

Alternatively, courts may analyze a TRO request using a sliding scale approach through which the elements of the "test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). This test requires plaintiffs to demonstrate the requisite likelihood of irreparable harm, show that an injunction is in the public interest, raise "serious questions" going to the merits, and show a balance of hardships that "tips sharply" in plaintiffs' favor. *Id.* at 1131–36 (concluding that the "serious questions" version of the sliding scale test for preliminary injunctions remains viable after *Winter*).

### III. ANALYSIS

#### A. Irreparable Injury

"Under *Winter*, plaintiffs must establish that irreparable harm is *likely*, not just possible, in order to obtain a preliminary injunction." *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (emphasis in original). "The key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." *Mclean v. Aurora Loan Servicing*, No. 11-0455, 2011 WL 4635027, at *1 (S.D. Cal. Oct. 5, 2011) (emphasis in original, quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)). "Economic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award." *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.,* 944 F.2d 597, 603 (9th Cir. 1991). "Monetary injury is not normally considered irreparable.*"* *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980).

| | |
|---|---|
| 1 | **1.     AT&T and Martis Camp Defendants** |

Plaintiffs have not shown why the injury they allege they will suffer is not addressable by monetary damages.  While in one portion of their motion plaintiffs argue that "no award of damages can compensate Plaintiffs for the destruction of their pristine" view, Mem. at 8, the complaint identifies an approximate $2 million dollar reduction in the value of their property if the cell tower construction proceeds.  Compl. ¶ 65.   The complaint itself invokes nonmonetary values, alleging the "tower will destroy the unique property view . . . and Plaintiffs' peaceful and beneficial possession of their property." *Id.* ¶ 2.  But plaintiffs themselves had not planned to continue using the Residence, which they "enjoy" and typically visit for ten weeks per year, Armstrong Aff. ¶ 3, once the sale they thought would close by March 30, 2021 was effected. *Id.* ¶ 20.  It is only because the planned sale went awry that plaintiffs must now remain in the house until June 2022, while their "primary residence in Victoria (Canada) is scheduled for a major renovation starting July 1st." *See id.* ¶ 32. While plaintiffs complain that their own "beautiful, unobstructed view of the golf course and mountains in the background," will be destroyed, *id.*, at least until they depart in slightly over a year, they do not provide authority supporting a grant of temporary injunctive relief to prevent this kind of short-term injury.  In their discussion of public interest factors, they do not identify protection of a uniquely pristine viewshed as a broader public consideration. Mem. at 10.  Given their plans to relocate, plaintiffs do not explain how recovering any reduction in their property value from AT&T or the Martis Camp defendants, who have contracted for the impending cell tower installation, is not a sufficient legal remedy.  "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Qualcomm Inc. v. Compal Elecs., Inc.,* 283 F. Supp. 3d 905, 914–15 (S.D. Cal. 2017) (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)) (addressing irreparable harm in context of stay).

Even if plaintiffs identified a type of harm that could justify immediate injunctive relief, it appears some time remains before the cell tower itself is erected.  Opp'n at 7-8; Johnson Decl. ¶ 15.  In that time the court could hear a properly noticed and briefed motion for preliminary injunction.

## 2. Placer County

Plaintiffs also say they will experience irreparable injury if a temporary restraining order does not issue, given the deprivation of their constitutional rights by Placer County. Specifically, plaintiffs argue construction of the cell tower will permanently deprive them of their First Amendment right to petition the government. Mem. at 6; Armstrong Aff. ¶¶ 28–29. Plaintiffs represent that Placer County's administrative review process, which has been completed, did not afford them notice or an opportunity to oppose the cell tower construction. Mem. at 6. Plaintiffs cite no legal authority to support their position given the factual allegations of this case. Constitutional violations may be the basis of irreparable injury, but the cases plaintiffs cite involve parties seeking injunctive relief before the threatened constitutional violation has occurred. *See, e.g., Elrod v. Burns*, 427 U.S. 347, 373 (1976) (at time injunctive relief was sought, public employees were being threatened with discharge for their political beliefs). "It is not enough that the claimed harm be irreparable; it must be imminent as well." *Vico v. U.S. Bank*, No. 1208440, 2012 WL 12888826, at *6 (C.D. Cal. Oct. 29, 2012); *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("[A] plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." (emphasis in original)). In this case, plaintiffs' alleged constitutional violations based on the First Amendment are not imminent or prospective. If the County did commit constitutional violations, those violations occurred in the past. Compl. ¶¶ 49–65 (describing County's administrative review permit process, which "does not require an applicant to provide notice and present its application at a public hearing" if upon initial review of an application the cell tower antennae is not "visually obtrusive"); *id.* ¶ 70 (because persons in plaintiffs' shoes "are not notified and are unaware of pending cell tower projects, they cannot file a timely appeal with the County"). Plaintiffs cite no legal authority or probative evidence to support any argument that construction of the cell tower will deprive them of an ongoing constitutional right. *See Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) (reversing entry of preliminary injunction because movant's evidence was insufficient to demonstrate irreparable harm).

### 3. Conclusion

The Armstrongs have not satisfied their burden of showing they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. The court therefore need not review the additional factors relevant to determining whether a temporary restraining order should issue. *See Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1174 (9th Cir. 2011).

### B. Delay

Plaintiffs' delay also counsels against granting the temporary restraining order they request. This district's Local Rules impose specific requirements on any party that requests temporary injunctive relief. *See* L.R. 231. In evaluating the merits of a temporary restraining order, the applicable rule provides as follows:

> In considering a motion for a temporary restraining order, the Court will consider whether the applicant could have sought relief by motion for preliminary injunction at an earlier date without the necessity for seeking last-minute relief by motion for temporary restraining order. Should the Court find that the applicant unduly delayed in seeking injunctive relief, the Court may conclude that the delay constitutes laches or contradicts the applicant's allegations of irreparable injury and may deny the motion solely on either ground.

L.R. 231(b). Here, plaintiffs were aware of the impending construction of the cell tower since at least as early as late March 2021. On April 7, 2021, plaintiffs emailed the Martis Camp Club Executive staff and informed them they planned to litigate the issue before May 3. Johnson Decl. ¶ 13. Plaintiffs then waited more than three weeks to file suit, moving for a temporary restraining order on the Friday afternoon before the Monday morning when they say construction is due to begin. This delay supports denial of the motion for a temporary restraining order. *Mammoth Specialty Lodging, LLC v. We-Ka-Jassa Inv. Fund*, LLC, No. 10-0864, 2010 WL 1539811, at *2 (E.D. Cal. Apr. 16, 2010) (two-week delay in filing temporary restraining order and doing so three days before foreclosure sale sufficient to deny motion). The delay also undercuts plaintiffs' arguments that they will suffer irreparable harm. *See Oakland Trib., Inc. v. Chron. Pub. Co.*,

762 F.2d 1374, 1377 (9th Cir. 1985); *see also Cocina Cultura LLC v. Oregon*, No. 20-02022, 2020 WL 7181584, at *4 (D. Or. Dec. 7, 2020) (plaintiff's three-month delay in seeking injunctive relief signaled "a lack of urgency and irreparable harm").

### IV.     CONCLUSION

The court **denies** plaintiffs' motion for a temporary restraining order. The Armstrongs may calendar their motion for a preliminary injunction motion on the court's regular calendar to allow for full briefing by all affected parties.

This order resolves ECF No. 4.

IT IS SO ORDERED.

DATED: May 3, 2021.

_____
CHIEF UNITED STATES DISTRICT JUDGE